UNITED STATES of America, Plaintiff–Appellee,

v.

Jorge Andres VERDUZCO, Defendant–Appellant.

No. 03–50044.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 2003.

Filed June 29, 2004.

---

Timothy A. Scott, Federal Defenders of San Diego, Inc., San Diego, CA, argued the cause and filed briefs for the defendant-appellant.

Dorn Bishop, Assistant U.S. Attorney for the Southern District of California, San Diego, CA, argued the cause and filed briefs for the plaintiff-appellee. Carol C. Lam, U.S. Attorney, and Roger W. Haines, Jr., Assistant U.S. Attorney, were also on the briefs.

Before: BRIGHT,* O'SCANNLAIN, and McKEOWN, Circuit Judges.

* The Honorable Myron H. Bright, Senior Unit- ed States Circuit Judge for the Eighth Circuit,

O'SCANNLAIN, Circuit Judge:

We must decide whether a defendant who drove a marijuana-laden sports utility vehicle into the United States from Mexico was validly convicted of illegal drug importation, notwithstanding a vigorous defense of duress.

I

On the morning of March 22, 2002, Jorge Andres Verduzco drove a Ford Explorer packed with 52.20 kilograms of marijuana from Mexico into the United States. Verduzco made it no further than the San Ysidro, California Port of Entry, where he immediately aroused the suspicions of border inspectors and their drug detector dog. Thirty-six packages of marijuana were discovered hidden throughout the sport utility vehicle.

Verduzco, a United States citizen and Los Angeles resident, was arrested at the Port of Entry. After receiving *Miranda* warnings, Verduzco admitted knowing that his vehicle was loaded with marijuana. He also described what had led him to make the smuggling attempt. Verduzco was raised in Tijuana, Mexico, where his parents still live. While visiting them a week earlier, he had met an unidentified Hispanic man at a store there. The two men had struck up a conversation, and Verduzco had confided some financial difficulties, which arose in part from his girlfriend's pregnancy. The man proposed to pay Verduzco $2500 to smuggle a load of marijuana across the border. Verduzco assented and returned to Los Angeles with a mobile phone the man had provided. A few days later, the call came; and Verduzco returned by bus to Tijuana, met the smugglers, received from them the pre-loaded vehicle, and drove to the Port of Entry, where he was intercepted.

In what seemed to be an open-and-shut case, the grand jury issued a two-count indictment against Verduzco, charging importation of 50 kilograms or more of marijuana, *see* 21 U.S.C. §§ 952, 960, and possession with intent to distribute of 50 kilograms or more of marijuana. *See* 21 U.S.C. § 841(a)(1).

Shortly before trial, Verduzco unveiled a new defense: duress, supported by a fresh account of events in the week prior to his arrest. At trial, Verduzco denied neither his act nor his intent; rather, he contended that he had been forced by Mexican drug traffickers to smuggle the marijuana. In contrast with his story at the border, Verduzco testified that he had struck a black BMW in the parking lot of a Tijuana pharmacy while driving his father's car. Three well-dressed men had piled out and angrily confronted him. Verduzco apologized and offered either to pay for the damage in a few weeks or to accompany them right then to his father's place, where he could retrieve some money immediately. The armed men, who also scared off a police officer who entered the parking lot, refused this offer. Instead, by threat, they required Verduzco to "do a job" for them. Verduzco took the phone they provided and returned to Los Angeles. When the call came, he returned to Mexico, met the three men, and proceeded to the border, followed all along by several tracking vehicles. He never told law enforcement of the threats because he feared the authorities were corrupt and would not protect his family.[1]

---

sitting by designation.

1. Verduzco's father, sister, and a family friend also offered testimony in support of the new theory. According to their testimony, Verduzco did not speak of the threats prior to the arrest. His father, however, testified that Verduzco was white-faced and quiet after returning from the accident and that suspicious-

It turns out that Verduzco had a conviction two years earlier for a nearly identical smuggling episode through the same Port of Entry. The government brought out this prior conviction—and the strikingly similar details of the earlier criminal act—in its cross-examination of Verduzco, and mentioned the episode again at several other points at trial. The defense moved for a mistrial, arguing that use of the prior conviction exceeded the scope of permissible impeachment and that it was impermissible propensity evidence. The court denied the motion.

At the end of the defense's case, the court formally excluded a proposed defense expert witness, who would have offered what the court termed "cultural stereotyping" testimony to attempt to explain why Verduzco failed to report the alleged threats against him to the police. The court based its decision to exclude the witness upon the defendant's having violated a discovery rule regarding the expert's qualifications, the prejudicial and confusing nature of the proposed testimony, and its lack of relevance.

After closing arguments, the importation count was submitted to the jury. During its deliberations, the jury sought clarification on the meaning of the term "reasonable" and the court issued a supplemental instruction. Several minutes later, the jury returned a guilty verdict. The government then dismissed the possession count, because it would have no effect for sentencing purposes.

The district court sentenced Verduzco to 30 months in prison and three years of supervised release. Verduzco timely appeals.

ly well-dressed men had come to his home approximately a week later. His sister, with whom Verduzco lived in Los Angeles, testified that Verduzco was uncharacteristically quiet

## II

Verduzco first urges that the district court erred by permitting the introduction of evidence regarding his prior drug smuggling, which the court admitted pursuant to Fed.R.Evid. 404(b) and 609. Though the government introduced this evidence primarily by its cross-examination of the defendant, the government also referenced the conviction at other points, including during the cross-examination of the defendant's father and in its closing statement.

### A

 We first consider admissibility under Fed.R.Evid. 404(b). Rule 404(b) forbids the admission of evidence of "other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith." Fed. R.Evid. 404(b). This prohibition reflects the "underlying premise of our criminal justice system, that the defendant must be tried for what he did, not for who he is. Thus, guilt or innocence of the accused must be established by evidence relevant to the particular offense being tried, not by showing that the defendant has engaged in other acts of wrongdoing." *United States v. Bradley*, 5 F.3d 1317, 1320 (9th Cir.1993) (internal quotation marks and citations omitted). Because such evidence may be highly relevant, however, the Rule does permit its admission "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident...." Fed.R.Evid. 404(b). *See United States v. Hearst*, 563 F.2d 1331, 1337 n. 3 (9th Cir.1977) ("The Rule embodies an inclusionary rule which admits all

in the days prior to the smuggling attempt. The family friend testified that he saw the altercation and threat in the parking lot.

evidence of other crimes relevant to an issue in a trial, except that which tends to prove *only* criminal disposition." (internal citation and quotations omitted)). In making admissibility decisions, the court will admit Rule 404(b) evidence if (1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged. *United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir.1994); *United States v. Garcia–Orozco*, 997 F.2d 1302, 1304 (9th Cir.1993); *United States v. Bibo–Rodriguez*, 922 F.2d 1398, 1400 (9th Cir.1991).

### 1

■ At Verduzco's trial, the district judge instructed the jury that the prior crime could be considered "only as it bears on the Defendant's intent, preparation, plan, knowledge, absence of duress, and for no other purpose." Verduzco contests each of these five bases for admission, arguing that absence of duress is not a permissible ground for admission, that preparation and plan were not elements of the offense, and that intent and knowledge were conceded by the defense. We focus initially on whether the bad acts evidence was admissible to show "absence of duress." If it were, then any error in the alternative bases would be harmless. *See United States v. Cordoba*, 104 F.3d 225, 229 (9th Cir.1997).

Our court has previously addressed the admissibility of Rule 404(b) evidence to show absence of duress. In *United States v. Hearst*, 563 F.2d 1331 (9th Cir.1977), Patty Hearst raised a duress defense at her trial for armed bank robbery in San Francisco. We approved the admission of evidence under Rule 404(b) connecting

Hearst to criminal activity at a Los Angeles sporting goods store and to a kidnaping and theft, separate events that occurred approximately one month after the bank robbery for which she stood trial. *Id.* at 1335–36. The circumstances of the later criminal acts, we reasoned, were relevant to her state of mind and tended to show that "appellant had not acted under duress when she participated in the bank robbery." *Id.* at 1336. We explained:

> The trial judge was called upon to balance the need for the evidence in the search for the truth against the possibility that the jury would be prejudiced against appellant because the evidence revealed she had participated in other conduct that was criminal. The district court acted well within its discretion in admitting the evidence. Appellant's state of mind during the San Francisco robbery was the central issue in the case. State of mind is usually difficult to prove, and the evidence on the issue was sharply divided. The timing and other circumstances of the Los Angeles incidents made evidence of them highly probative on this critical issue. Though criminal, the incidents were not of a kind likely to inflame the jury. The prejudice to appellant arose primarily from the light the evidence cast on appellant's state of mind during the San Francisco robbery and not from the incidental circumstance that it revealed appellant's involvement in other criminal acts.

*Id.* at 1337. As in *Hearst*, Verduzco's state of mind was the central issue at trial, the parties offered sharply divergent accounts, and the circumstances of the prior smuggling attempt were plainly probative, though by no means dispositive, of his state of mind on this occasion.

*United States v. McCollum*, 732 F.2d 1419 (9th Cir.1984), is also analogous, posing the question whether prior bad acts

evidence was relevant in assessing a defendant's claim that he was acting under hypnosis while robbing a bank. In *McCollum,* we held that evidence of a twelve-year old bank robbery conviction was admissible under Rule 404(b) "for the purpose of showing ... intent." *Id.* at 1424. "Such a prior act can be probative of intent because the fact that the defendant had an unlawful intent at the time he committed the extrinsic offense makes it less likely that he had a lawful intent when he performed the acts charged as the present offense." *Id.* at 1424; *see also id.* at 1425 ("Where the mental state to be inferred from undisputed overt acts of a defendant is the crucial issue, evidence of past criminal acts has generally been found insufficiently prejudicial to warrant exclusion."). Thus, as in *Hearst,* such use in *McCollum* of relevant bad acts evidence was neither impermissible propensity evidence nor character evidence; instead, it tended permissibly to show state of mind.

Verduzco would distinguish *Hearst* and *McCollum* on the theory that in both cases the government was obliged to prove the state of mind that the challenged evidence sought to illuminate. In *Hearst,* for reasons immaterial to this appeal, the government had the burden to prove the absence of duress. *United States v. Dominguez–Mestas,* 929 F.2d 1379, 1383 (9th Cir.1991) (noting different burden). Similarly, in *McCollum,* the defendant contends, the government retained the burden of proving criminal intent over the defendant's insanity defense. By contrast, Verduzco had the burden of proving duress by a preponderance of the evidence.

■ Verduzco emphasizes the first prong of our test, which as recited in one case states that "the evidence sought to be introduced must establish a *material element* in the case." *United States v. Palmer,* 3 F.3d 300, 305 (9th Cir.1993) (empha-

sis added). He reasons that because he contested neither the offense conduct nor the underlying intent, choosing instead to rest his defense entirely upon a theory of duress, no "material element" of the offense was in dispute. Thus he would read the "material element" literally to preclude admission of evidence that does not tend to prove a material element but that rather merely tends to disprove a defense. Because a duress defense does not involve refutation of any of the elements of the offense, the burden is on the defendant to prove the defense by a preponderance of the evidence. *See Dominguez–Mestas,* 929 F.2d at 1384. Accordingly, appellant's argument would allow admission of bad acts evidence when relevant to the mental state that the government must prove as an element of the crime, but disallow the same evidence when relevant to the state of mind necessary to an affirmative defense.

We have, as the defendant stresses, stated that "the evidence sought to be introduced must establish a material element in the case." *See United States v. Palmer,* 3 F.3d 300, 305 (9th Cir.1993). Verduzco's formalistic reading of the "element" language, however, neither squares with the court's language in numerous other cases nor supports any identified evidentiary policy. For example, rather than stating consistently that the evidence must prove a "material element," the court has frequently substituted the terms "material issue" and "material point" in the same context. *See, e.g., Mayans,* 17 F.3d at 1181 ("material point"); *Garcia–Orozco,* 997 F.2d at 1304 ("material point" and "material issue"); *U.S. v. Ramirez–Jiminez,* 967 F.2d 1321, 1325 (9th Cir.1992) ("material issue"); *Bibo–Rodriguez,* 922 F.2d at 1400 ("material point"). Aside from this question of word choice, our cases betray no indication that Rule 404(b)

evidence must be relevant to an element of the statutorily defined offense, as opposed to an element of an affirmative defense.

Moreover, it is questionable what policy interest might underlie admitting 404(b) evidence to assist the government's proof but not to rebut the defendant's affirmative defense. While we are deeply mindful of the dangers of propensity evidence, the risk of prejudice is seemingly most acute when the government seeks to employ such evidence to satisfy its constitutional burden of proof. *Cf. Patterson v. New York,* 432 U.S. 197, 210, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) ("[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged."). In contrast, the Court has noted the "long-accepted rule" making it "constitutionally permissible to provide that various affirmative defenses were to be proved by the defendant." *Patterson,* 432 U.S. at 211, 97 S.Ct. 2319. In particular, we have held that "due process does not require the prosecution to prove absence of duress." *Walker v. Endell,* 850 F.2d 470, 473 (9th Cir.1987). To be clear, the prejudicial risk that bad acts evidence presents is doubtless serious when offered to disprove an element of an affirmative defense, and courts in that circumstance are obliged fully to consider that risk. *See* Fed.R.Evid. 403. But we are not persuaded that bad acts evidence admitted against an affirmative defense is somehow more troubling than when the same evidence is admitted to help prove a material element of the statutorily defined offense.

Other circuits agree with us that Rule 404(b) evidence may be admitted to refute a duress defense. *See, e.g., United States v. Zanabria,* 74 F.3d 590, 592 (5th Cir. 1996) (eight-year old cocaine conviction admissible to show intent and refute duress defense in trial for similar offense); *United States v. Boon San Chong,* 829 F.2d 1572, 1574–76 (11th Cir.1987) (evidence of prior home invasion admissible in trial for extortion to refute defendant's claim that his participation in extortion conspiracy was coerced by mafia); *id.* at 1576 ("When the prior act is similar to the charged offense and is proximate in time to the charged offense ... the extrinsic act is relevant and highly probative on the issue of the defendant's state of mind."); *United States v. Holman,* 680 F.2d 1340, 1348–50 (11th Cir.1982) (evidence of prior smuggling activities admissible to undermine defendant's claim that he participated in drug smuggling because of threats on his son's life); *United States v. Hunter,* 672 F.2d 815, 817 (10th Cir.1982) (evidence of prior bank robbery admissible to undermine duress defense when "very close to the one at issue in point of time and in method of commission").

2

 Verduzco also urges that, even if the strictures of 404(b) were satisfied, the prejudicial impact of the evidence outweighed its probative value and thus violated Fed.R.Evid. 403.[2] We review for abuse of discretion. *United States v. Gon-*

---

**2.** Nor did the district court, as a procedural matter, inadequately apply Rule 403 before admitting the evidence. "As long as it appears from the record as a whole that the trial judge adequately weighed the probative value and prejudicial effect of proffered evidence before its admission, we conclude that the demands of Rule 403 have been met." *United*

*States v. Sangrey,* 586 F.2d 1312, 1315 (1978). Here, the defendant raised the prejudice argument at multiple points throughout the pretrial proceedings and at trial. *See id.* While a more explicit statement by the court may have been helpful, the record makes clear that the question of prejudice figured crucially in the court's mind.

*zalez–Torres*, 309 F.3d 594, 601 (9th Cir. 2002). The crux of appellant's argument is that the probative value of the prior bad act was weaker because the defendant conceded the material elements of the offense. It is true that "a party's concession is pertinent to the court's discretion to exclude evidence on the point conceded." *Old Chief v. United States*, 519 U.S. 172, 184, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (citing Advisory Committee's Notes on Fed. Rule Evid. 401). The district court, however, admitted the evidence not principally as probative evidence vis-a-vis the importation elements, but rather as evidence relevant to the duress defense. In this context, it was clearly relevant to the defendant's state of mind and the believability of the testimony he presented at trial. "Where the mental state to be inferred from undisputed overt acts of a defendant is the crucial issue, evidence of past criminal acts has generally been found insufficiently prejudicial to warrant exclusion." *McCollum*, 732 F.2d at 1425. We are satisfied that there was no abuse of discretion in the court's Rule 403 analysis.

### B

■■■ Verduzco also argues that the district court erred in admitting the bad acts evidence under Rule 609. If evidence is properly admitted under one rule, then improper admission under the second rule is harmless. *Cordoba*, 104 F.3d at 229. Accordingly, because we conclude that the court did not abuse its discretion by admitting the evidence under Rule 404(b), we need not reach Verduzco's arguments with respect to admission under Rule 609.

---

**3.** We generally review for abuse of discretion a district court's response to a juror inquiry. *United States v. Amlani*, 111 F.3d 705, 716 (9th Cir.1997). However, we review de novo whether a jury instruction correctly states the

### III

■■■ Verduzco next claims that the district court erred in responding as it did to the jury question presented during deliberations.[3]

■■■ The duress defense consists of three elements, each of which the defendant must prove by a preponderance of the evidence: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) lack of a reasonable opportunity to escape the threatened harm. *United States v. Moreno*, 102 F.3d 994, 997 (9th Cir.1996); *United States v. Becerra*, 992 F.2d 960, 964 (9th Cir.1993); *see United States v. Hernandez–Franco*, 189 F.3d 1151, 1157–1158 (9th Cir.1999) (upholding allocation of burden of proof to defendant). Given that five days passed between the alleged threat and the smuggling attempt, during which time Verduzco could have approached law enforcement authorities in either the United States or Mexico, a central issue at trial was whether Verduzco lacked a "reasonable opportunity" to escape the threatened harm.

During its deliberations, the jury asked the court, "Does the term 'reasonable' relate to the reasonableness in the Defendant's mind or the jurors' individual mind or collective mind." The court answered with the following supplemental instruction:

> The standard of reasonableness is to be determined by what a reasonable person would do under the same or similar circumstances. In making this determination, you are to consider all of the facts

---

law, *see United States v. Lafleur*, 971 F.2d 200, 204 (9th Cir.1991), and whether an instruction violates due process. *United States v. Amparo*, 68 F.3d 1222, 1224 (9th Cir.1995).

in evidence in the case, including whether one in the defendant's position might believe that reporting the matter to the police did not represent a reasonable opportunity of escape. However, the opportunity to escape must be reasonable. Generally, once a defendant has reached a position where he can safely turn himself in to the authorities, he will have a reasonable opportunity to escape the threatened harm, but you may consider all of the facts in evidence in deciding reasonableness in this case. In making the decision on reasonableness, you should consider all the facts in evidence in the case and the court's instructions on the law.

The jury returned a guilty verdict several minutes after receiving the supplemental instruction.

■ Verduzco quarrels with a clause in one sentence of the court's instruction: "*Generally, once a defendant has reached a position where he can safely turn himself in to the authorities, he will have a reasonable opportunity to escape the threatened harm*, but you may consider all of the facts in evidence in deciding reasonableness in this case" (emphasis added). He contends that this answer was tantamount to directing the verdict insofar as it exceeded the jury's narrow question, that it interfered with the jury's application of law to fact, and that it violated the defendant's constitutional due process rights. He stresses that the jury returned its ver-

dict approximately three minutes after receiving the instruction.[4]

■ Trial courts must respond to jury questions with particular care and acumen. *See United States v. Walker*, 575 F.2d 209, 214 (9th Cir.1978) ("Because the jury may not enlist the court as its partner in the fact-finding process, the trial judge must proceed circumspectly in responding to inquiries from the jury."). *See also United States v. Martin*, 274 F.3d 1208, 1210 (8th Cir.2001) ("[T]he trial judge should answer with concrete accuracy, and within the specific limits of the question presented." (internal quotations and citations omitted)).

■ The challenged sentence was indisputably a correct statement of the law, as Verduzco concedes, and the district court drew it explicitly and verbatim from this court's precedent. *See United States v. Contento–Pachon*, 723 F.2d 691, 695 (9th Cir.1984) ("Once a defendant has reached a position where he can safely turn himself in to the authorities he will likewise have a reasonable opportunity to escape the threatened harm."). Fittingly, *Contento–Pachon* dealt with a duress defense to drug importation charges. To this statement of law the court added the preface "Generally," which made the instruction significantly more favorable to the defendant and his theory of police corruption, and added a clause stressing that the jury "may consider all of the facts in evidence in deciding reasonableness in this case," which had the same effect. Moreover, the sentence was but one component of a thor-

---

4. The government opposed any duress instruction at trial, and it contends on appeal that the district court erred by offering such instruction, given circuit law affirming that "[f]ear alone is not enough to establish a prima facie case of duress," *Moreno*, 102 F.3d at 997 (internal quotations and citations omitted), and given that Verduzco offered no evidence why he was unable to escape beyond his own general fear that police authorities

were corrupt. *Id.* at 997 (noting requirement that defendant show "lack of a reasonable opportunity to escape the threatened harm"); *but see United States v. Otis*, 127 F.3d 829, 835 (9th Cir.1997). Despite its reluctance, the court gave the instruction, albeit with "reservations." Given our holding, we need not reach the question of whether the instruction was in error.

ough statement of the law, the accuracy of which has not been challenged. We are satisfied that, read in context, the contested language neither directed the verdict, constituted judicial fact-finding, nor exceeded the scope of the question in a prejudicial way.[5]

## IV

▮▮▮ Verduzco's third contention is that the district court erred by excluding his proposed expert witness, a Ph.D. sociologist, whose testimony on the drug culture of Tijuana would have, in Verduzco's view, assisted his defense.

As noted, to prevail on his duress defense, Verduzco was required to show, inter alia, that he lacked a reasonable opportunity to escape the threatened harm. *Moreno*, 102 F.3d at 997. The sociologist would have testified that those socialized in Mexico, where police are connected to drug-trafficking organizations, are more reluctant to approach law enforcement authorities. More specifically, the testimony would have explored the pervasiveness and violence of the Tijuana drug cartels to "provide necessary cultural perspective to help show that no reasonable means of escape appeared available to Mr. Ver-

duzco, considering, inter alia, government corruption, the reach of the drug organizations, and their deadly power." The district court was initially inclined during pretrial motions not to permit the proposed expert testimony; however, it deferred a decision until after the defense presented its case.

▮▮▮▮▮ Though it purportedly based its exclusion decision "primarily" upon the defendant's discovery violation, *see* Fed. R.Crim.P. 16, the court outlined three specific rationales for its decision, which we review for abuse of discretion.[6]

First, the court had strictly applied Rule 16 to exclude a prosecution expert when, shortly before trial, the government changed an expert's identity due to scheduling difficulties.[7] The defense expert's resume erroneously stated that the expert worked for *Zeta*, a publication, and the resume was prepared partly in Spanish. Moreover, Verduzco had only disclosed the erroneous qualification in response to the court's questioning on the day before trial. Because it had applied Rule 16 strictly to the government, the court excluded the defense expert as an explicit sanction.

Second, the court found "huge 403 problems." *See* Fed.R.Evid. 403.[8] Verduzco

---

**5.** Verduzco's argument that the instruction constituted an improper "permissive inference" is similarly unconvincing. "A permissive inference instruction allows, but does not require, a jury to infer a specified conclusion if the government proves certain predicate facts.... [I]t violates due process if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *U.S. v. Warren*, 25 F.3d 890, 897 (9th Cir.1994) (internal quotations omitted). Here, the supplemental instruction was simply a correct recitation of the law, not a permissive inference.

**6.** We review decisions to exclude expert testimony for abuse of discretion, *United States v. Seschillie*, 310 F.3d 1208, 1211–12 (9th Cir. 2002), and have stressed that the "trial court

has broad discretion to admit or exclude expert testimony". *United States v. Aguon*, 851 F.2d 1158, 1171 (9th Cir.1988) (en banc), *overruled on other grounds, Evans v. United States*, 504 U.S. 255, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992). We may reverse "only if such nonconstitutional error more likely than not affected the verdict." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir.2000).

**7.** The government had sought to replace a Customs expert who would testify to the marijuana's value with another Customs expert who would offer the same testimony using the same methodology.

**8.** Fed.R.Evid. 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially out-

testified that he lacked a reasonable opportunity to escape the threatened harm because he distrusted the police authorities. His stated basis for this distrust was that Mexican police had previously stopped him and asked him for money, not because of any connection to drug cartels. The court characterized any connection between Verduzco's alleged fear of the police with the expert's testimony on Tijuana drug culture as "very tenuous."

Third, the court determined that generalized "cultural stereotyping" testimony on Tijuana would be unhelpful because Verduzco had graduated from a United States high school, had lived in the United States for at least two years prior to the arrest, spoke English, had a sister caring for him in the United States, and worked for a United States corporation. The court hypothesized that the testimony might be helpful if the defendant had a green card and had not been educated in the United States. Here, by contrast, the defendant was experienced in American life, and thus the testimony would have less relevance.

■ Exclusion of a witness as a sanction for a violation of a discovery rule in a criminal trial is generally appropriate "only in cases involving 'willful and blatant' " violations. *United States v. Peters*, 937 F.2d 1422, 1426 (9th Cir.1991) (internal citations excluded); *United States v. Finley*, 301 F.3d 1000, 1018 (9th Cir.2002); *Taylor v. Illinois*, 484 U.S. 400, 415, 108

S.Ct. 646, 98 L.Ed.2d 798 (1988). Had this minor discovery violation been the sole ground for the court's exclusion of an essential witness, there might have been an abuse of discretion, given the importance the Constitution accords to a defendant's right to present witnesses in his defense.[9] *See* U.S. CONST. amend. VI.

■ Here, however, the district court also cited both "huge 403 problems" with the generalized "cultural stereotyping" testimony and separately concluded that insufficient foundation had been laid to support the testimony's relevance.[10] *See* Fed. R.Evid. 401, 403; *Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1005 (9th Cir.2001) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 ... exercises more control over experts than lay witnesses." (quoting *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786)).

With respect to Rule 403, the court was required to weigh the risk of prejudice and confusion against the probative value of the evidence, and it was understandably chary of "cultural stereotyping" testimony—in this case, testimony that sought to link the actions or beliefs of a defendant with those of a particular nationality. *See, e.g., Jinro Am.*, 266 F.3d at 1006–09 (noting "the problem of testimony that either

---

weighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
Fed.R.Evid. 403.

9. The district court earlier accused the defense of attempting to "sand-bag" the court by attempting to file the expert's statement shortly before trial. That episode, however, did not figure explicitly in the court's sanctions decision.

10. Was the district court first required to hold a hearing pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as Verduzco requested? No. Where a district court has already excluded testimony under one evidentiary rule, no *Daubert* hearing, which is used to assess the scientific validity of an expert's underlying reasoning or methodology, is required. *See United States v. Booth*, 309 F.3d 566, 573 (9th Cir.2002).

directly or indirectly seeks to link a defendant's conduct to that which is said to be typical of a particular racial, ethnic group or nationality"); *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1151 (9th Cir. 2001) ("Racial stereotyping cannot be condoned in civil cases."); *United States v. Cabrera*, 222 F.3d 590, 594 (9th Cir.2000) (noting, in a case where the government's lead witness repeatedly referenced the defendant's national origin, "numerous authorities recognizing that references to racial, ethnic, or religious groups are not only improper and prejudicial but also reversible error"); *Bains v. Cambra*, 204 F.3d 964, 974–75 (9th Cir.2000) (condemning as error prosecutor's closing argument suggesting that "Sikhs" had a tendency to violence and retribution). While many of our reported racial or cultural stereotyping cases involve testimony or argument with far greater inflammatory potential than contemplated here, we cannot conclude on these facts that the district court abused its discretion by excluding testimony that sought to establish the reasonableness of Verduzco's alleged belief solely by the application of generic cultural and ethnic stereotypes and data. *Cf. United States v. Benavidez–Benavidez*, 217 F.3d 720, 725 (9th Cir.2000) ("Once the probative value of a piece of evidence is found to be substantially outweighed by the danger of unfair prejudice, there is no other evidentiary rule that can operate to make that same evidence admissible.").

The testimony was also likely to be confusing and prejudicial in other respects. Expert testimony on the defendant's mental state or condition would have been impermissible. Fed.R.Evid. 704(b); *United States v. Brodie*, 858 F.2d

492, 496 (9th Cir.1988); *cf. United States v. Komisaruk*, 885 F.2d 490, 494 (9th Cir. 1989) ("[E]xpert testimony cannot be offered to buttress credibility."). While Verduzco is correct that an expert can provide testimony that is not in the nature of an opinion, *see United States v. Rahm*, 993 F.2d 1405, 1411 (9th Cir.1993) ("[N]ot every expert need express, nor even hold, an opinion with regard to the issues involved in a trial."); *United States v. Langford*, 802 F.2d 1176, 1179 (9th Cir.1986) ("Opinion testimony on ultimate issues of fact is admissible unless the testimony concerns the mental state or condition of a defendant in a criminal case."), the expert evidence proffered here was aimed squarely at establishing Verduzco's subjective fear of police authorities, and only sharp limitations could conceivably have protected the testimony from running afoul of Rule 704(b).

Finally, generalized testimony on Mexican drug culture had at best a slim, tenuous connection to Verduzco and the particular facts of his case. As the district court noted, Verduzco was an American citizen, educated in the United States, resident in the United States, and employed by an America firm. *See Jinro Am.*, 266 F.3d at 1010–11 (Wallace, J., concurring) (generalized testimony on Korean business culture and practices irrelevant when not linked to particular businessman and particular business transaction at issue). Moreover, to the extent that there was an attenuated connection, the testimony promised to be of little value to a Southern California jury, which would be well aware of the image that violence and corruption is part and parcel of the illegal Mexican drug-trafficking business.[11] *See United States*

11. Verduzco contends that several cases admitting expert testimony to explain apparent inconsistencies in defendants' statements compel admission of the sociologist's testimo-

ny. For example, in *United States v. Vallejo*, 2001 U.S.App. LEXIS 7367 (9th Cir.2001), the court admitted a psychologist's testimony on "the special problems that former special ed-

*v. Finley,* 301 F.3d 1000, 1007 (9th Cir. 2002) ("[T]he subject matter at issue must be beyond the common knowledge of the average layman."); *United States v. Amaral,* 488 F.2d 1148, 1152–1153 (9th Cir.1973) (expert testimony excepted from rule barring opinion evidence when "such testimony serves to inform the court [and jury] about affairs not within the full understanding of the average man.") (quoting *Farris v. Interstate Circuit,* 116 F.2d 409, 412 (5th Cir.1941)).

Given the trial court's "broad discretion to admit or exclude expert testimony," *see Aguon,* 851 F.2d at 1171, we are satisfied that the district court did not abuse its discretion here.

**AFFIRMED.**

ucation students have when attempting to communicate in English in high pressure situations" to explain inconsistencies between the defendant's account of his interrogation with that of a customs agent. *Id.* at *26. Similarly, in *United States v. Bighead,* 128 F.3d 1329, 1330 (9th Cir.1997), the court found no abuse of discretion in admitting expert testimony about typical memory characteristics of child abuse victims, when a victim's ability to recall key facts was challenged at trial. *Id.* at 1330. Both such situations, though, involve testimony on scientific matters beyond the competence of lay jurors.